PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 10-3203
No. 10-3516

_____

ANTHONY T. BROWN

v.

*MICHAEL WENEROWICZ, SUPERINTENDENT,
SCI GRATERFORD; *RAYMOND LAWLER,
SUPERINTENDENT, SCI HUNTINGDON;
DISTRICT ATTORNEY OF THE COUNTY OF
PHILADELPHIA; ATTORNEY GENERAL OF THE
STATE OF PENNSYLVANIA,

Appellants

*(Amended per Clerk's Order of 12/15/10)

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 07-cv-01098)
District Judge:  Honorable Louis H. Pollak

_____

Argued September 20, 2011

Before:  FISHER, HARDIMAN and GREENAWAY, JR.,
*Circuit Judges*.

(Filed: December 8, 2011)

Salvatore C. Adamo [Argued]
Suite 300
1434 Knox Avenue
Easton, PA 18040
          *Attorneys for Plaintiff-Appellee*

Anne Palmer [Argued]
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA 19107
          *Attorneys for Defendant-Appellants*

———————

OPINION OF THE COURT

———————

HARDIMAN, *Circuit Judge*.

Anthony Brown was convicted in Pennsylvania state court of first-degree murder, reckless endangerment, and possession of an instrument of crime.  After exhausting his state court remedies, Brown filed a federal habeas petition pursuant to 28 U.S.C. § 2254(d)(1), claiming that the decision of the Pennsylvania Superior Court was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). The United States District Court for the Eastern District of Pennsylvania granted Brown's petition following an

evidentiary hearing. The Commonwealth appeals, claiming that under the stringent requirements of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Brown was entitled to neither a federal evidentiary hearing nor the issuance of the writ.

I

A

On September 7, 1998, the Rorie family attended a Labor Day celebration at the 600 block of Conestoga Street in Philadelphia, Pennsylvania. As the block party ended sometime after 8:00 p.m., the matriarch of the family, Frances Rorie, began to sweep the sidewalk while thirty others cleaned. Suddenly, Tiffany Thompson ran toward the crowd yelling "they're coming, they got a gun." A vehicle rounded the corner of Poplar and Conestoga Streets, and four men emerged from the car. One man fired a gunshot into the air. As Frances Rorie tried to find shelter behind a car, a second shooter pointed an Uzi pistol at the Rorie home and fired seventeen shots into the crowd. One shot hit Frances in the head, killing her instantly.

Frances Rorie's murder capped a day of heated confrontation between neighbors. The trouble began in the morning, when children from Conestoga Street argued with children from Girard Avenue. The mother of some of the Girard Avenue children was Kim Brown, sister of Appellee Anthony Brown. Accompanied by her friend, Sharon Carter, Kim approached Frances's granddaughter, Tamika Thompson, who referred the women to her mother, Alanda Rorie, at 647 Conestoga Street. There, Kim and Sharon argued with Alanda, Frances, and Yvonne Rorie.

3

The argument at Alanda Rorie's home did not relieve the tensions between the families. Sometime between 3:00 and 4:00 p.m., Kim Brown's son Hakim threw a rock at Yvonne Rorie's son Rafeek. The Rories then grabbed brooms and marched to the corner of Conestoga and Girard. The Browns in turn wielded knives while their friend, Kareema Latimer, threatened to "get her .357 and spray the whole corner." A few hours after Latimer issued her threat, Tamika and Yvonne spotted Appellee Anthony Brown, Anthony Fingers, Kevin Johnson, and two other men standing at the corner with Kareema Latimer, who pointed at the Rorie home.

According to Yvonne Rorie, the shooting started fifteen to twenty minutes later. Tamika Thompson later testified that she did not know precisely how much time elapsed, but knew it was more than five minutes later. A police radio call reported the shooting at 8:23 or 8:24 p.m.

When police arrived, Tamika and Yvonne reported that they had seen the men standing at the corner, that at least two of them had guns, and that one had pointed a gun at the Rorie home before he started shooting. Tamika described the assailant as tall, light-skinned, skinny, and about 22 years-old. She said he was wearing a blue cap with a red brim, a white shirt, and blue jean shorts, and driving a four-door gray car. Yvonne described the shooter as tall, light-skinned, and wearing a white shirt, blue or black shorts, and a white baseball cap. Yvonne also identified the shooter as Anthony Brown. Three days later, both Tamika and Yvonne picked Anthony Brown out of a photo array. At trial, Tamika again identified Anthony Brown as one of the shooters.

4

Tiffany Thompson, who saw the gunmen approaching, told police the shooter lived at 5408 Girard Avenue. The police promptly executed a search warrant for that address and discovered some clothing matching the descriptions Tamika and Yvonne had provided, including a white shirt, dark blue jean shorts, brown boots, and an Atlanta Braves cap. They also found a photo of Anthony Brown wearing the same clothes, his mail, and a traffic citation issued on the day of the shooting. A warrant issued for Brown's arrest, and he surrendered later that week.

B

At trial, Brown presented a misidentification defense and an alibi defense. His misidentification defense relied on the testimony of Frances Rorie's grandson, Gary Jones, and Rorie's daughter, Timmsel.

Contrary to the testimony of Tamika Thompson and Yvonne Rorie, Gary Jones testified on direct examination that the shooter was short, dark-skinned, and wearing a plaid shirt, blue shorts, black Timberland boots, and a red and blue Atlanta Braves cap. He described another man (not the shooter) as a light-skinned, bald, mustachioed man, who wore a tee-shirt, blue shorts, and Reebok sneakers. On cross-examination, the prosecution impeached Jones with his prior statement to police, which was not only contrary to his testimony on direct examination, but also similar to the descriptions given by Tamika Thompson and Yvonne Rorie shortly after the shooting. In that statement, Jones described the shooter as tall and light-skinned, wearing an Atlanta Braves cap, light blue shorts, a white shirt, and black boots.

5

Timmsel Rorie testified on direct examination that she initially described the shooter to police as tall, light-skinned, and wearing a red plaid shirt. She identified another man (not the shooter) as a tall, light-skinned man of 18 or 19, wearing a white shirt and long blue jeans. According to Timmsel, that man was Anthony Brown. On cross-examination, the prosecution impeached Timmsel with the fact that just days after the shooting she identified Anthony Brown as the shooter. Moreover, Timmsel eventually made an in-court identification of Anthony Brown as the shooter and testified that she did not correct her initial misstatement to the police because she wanted her boyfriend to kill Brown to avenge her mother's murder.

Brown's alibi defense relied on the testimony of Lynnette Bright, who was the college roommate of Brown's cousin, Tiyana Miller. According to Bright, she and Miller went to a TGI Friday's restaurant at 17th Street and Benjamin Franklin Parkway to buy take-out food at approximately 7:30 p.m. on the night of the shooting. Bright testified that about fifteen minutes after they arrived, Miller noticed Anthony Brown walking toward the front of the restaurant. Miller and Brown spoke for a few minutes before Brown returned to his table. Bright testified that she and Miller were seated near the front door of the restaurant, that they waited a long time to get their food, and that they left between 8:15 and 8:20 p.m. Bright stated that she never saw Brown leave.

On cross-examination, Bright admitted that she knew several of Brown's relatives. She was impeached with inconsistent statements regarding the time she arrived at the restaurant, as well as with her failure to cooperate with the District Attorney's investigation. Bright also was unable to describe what Brown was wearing at the restaurant. Finally,

6

Bright eventually admitted that she lied to a defense investigator when she told him that she saw Brown eating with his friends when she left the restaurant and she never saw Brown seated at his table.

Brown's cousin Tiyana Miller corroborated Bright's testimony that they went to the TGI Friday's between 7:15 and 7:30 p.m. According to Miller, it already was dark when they left for the restaurant, and they waited fifteen to twenty minutes before placing their order. While they waited, Miller saw Brown emerge from the dining area to use the phone,[1] and she chatted with him. Miller testified that she and Bright waited about an hour for their food and left at approximately 8:20 p.m. She stated that when she left, Brown still was seated with Anthony Fingers, Kevin Johnson, and two women.

Miller was impeached with evidence that after the shooting she returned to the restaurant to ask if they had a video surveillance system that could pinpoint when Brown left on the night of the murder. Her testimony was also undermined because she neither contacted family members to advise them that she had seen Brown that night, nor contacted the police with her information or responded to letters from the District Attorney. Finally, like Bright, she could not describe what Brown was wearing at the restaurant.

Kevin Johnson, who allegedly accompanied Brown to the restaurant, also testified for the defense. According to

---

[1] Kim Brown had called her brother, Anthony Brown, and he returned her call from a payphone at the restaurant. Kevin Johnson later testified that Brown told him the phone call concerned the dispute at Conestoga and Girard.

Johnson, they arrived at TGI Friday's before 7:00 p.m., while it was still daylight, and left after it was dark. He testified that they were seated on the second floor, not in the bar area where Bright and Miller could have seen them.

Finally, Brown testified in his own defense. Brown told the jury that on the day of the murder, he was driving to a different TGI Friday's when he received a traffic citation, which lists the time of the stop as 6:41 p.m. Brown gave the officer an alias and an incorrect address because he often violated traffic laws and feared being arrested. According to Brown, he arrived at the first TGI Friday's with Kevin Johnson, Anthony Fingers, and three women they met that afternoon, but it was crowded, so they decided to go to the TGI Friday's on the Parkway instead, arriving at approximately 7:10 to 7:15 p.m. After they were seated, Brown saw Miller and Bright near the door. He talked to them before his food arrived and eventually left the restaurant at 8:45 p.m.[2]

Brown testified that after leaving the restaurant, he, Anthony Fingers, and Kevin Johnson drove to Johnson's automotive detail shop at 59th and Race Streets, where they spent about ten minutes. Brown claimed they then drove home to Girard Avenue, where he found police already gathered.

---

[2] Although Brown later conceded on collateral review that he was given a receipt for his bill at TGI Friday's, he never offered it into evidence to corroborate when he left the restaurant.

C

Brown was represented at trial by attorney Tariq El Shabazz. When El Shabazz rose to call the defense's alibi witnesses, the prosecution objected because El Shabazz had failed to file a notice of alibi as required under Pennsylvania law. *See* Pa. R. Crim. P. 567. El Shabazz initially claimed that he had filed the notice, but later admitted that he had not. Notwithstanding El Shabazz's failure to file a notice of alibi, the trial court allowed Bright, Miller, and Johnson to testify because the prosecution had received written statements from them. But the trial court excluded two alibi witnesses who worked at TGI Friday's: manager Andre Osborne and waitress Stacy Szmyt.

The jury convicted Brown of all charges. After his post-trial motions were denied, Brown raised several issues on direct appeal, including that counsel was ineffective for failing to file a notice of alibi. The Superior Court dismissed the claims without prejudice to Brown's right to raise them on collateral review. The Pennsylvania Supreme Court subsequently denied Brown's petition for allowance of appeal.

D

Brown filed a petition for collateral review under Pennsylvania's Post-Conviction Relief Act (PCRA), raising the same issues he raised on direct appeal. Brown later filed a supplement to the petition, arguing for the first time that his counsel was ineffective for failing to present the testimony of Malik Easley, an alleged eyewitness to the shooting.

Attached to Brown's PCRA petition were two witness statements and three affidavits further supporting his alibi. The witness statements were from the two witnesses who had not been permitted to testify at trial: Andre Osborne and Stacy Szmyt. Osborne confirmed he was a manager at TGI Friday's on the night of the shooting and that he saw Brown with two other men and some women at Table 307. Osborne stated that he remembered them because they were loud and because he suspected they might not pay their bill. Osborne was unsure what time the group left but remembered that the sun had already set. Szmyt stated that she waited on Table 307 that night and vaguely remembered serving a rowdy group. She offered no information about when the group departed.

The three affidavits supported Brown's claim that his counsel was ineffective. Brown's father, Arthur Boyer, attested that he told El Shabazz several times prior to trial that alibi witnesses were available and asked if El Shabazz had interviewed the waitress at the restaurant. El Shabazz replied that he was "working on it." In a second affidavit, Brown claimed he informed El Shabazz of his alibi, gave him the names of his dinner companions, and told him their waitress's name was Stacy. Brown claimed that El Shabazz: (1) never interviewed any of the diners; (2) hired an investigator to locate witnesses but failed to pay the fee; and (3) hired a new investigator only on the eve of trial. The new investigator, Brian Grevious, stated in an affidavit that he was retained three days prior to trial and that he located Osborne and Szmyt and took their statements.

The PCRA court dismissed Brown's petition for collateral relief. *Commonwealth v. Brown*, C.P. 9810–0366, at *1 (Pa. Comm. Pleas Ct. June 6, 2008). Citing both

*Strickland v. Washington* and state law precedents, the court rejected Brown's ineffective assistance claim. *Id.* at *5–17. The court reasoned that El Shabazz's performance was not deficient because he did not learn of the two alibi witnesses until the sixth day of trial. *Id.* at *7. The court also concluded that the absence of Osborne's and Szmyt's testimony did not prejudice Brown because, even assuming its relevancy, it would have been "cumulative" and "unnecessary." *Id.* at *8.

Brown appealed to the Pennsylvania Superior Court, which affirmed. *Commonwealth v. Brown*, No. 2271 EDA 2005, at *1 (Pa. Super. Ct. Apr. 9, 2009). The Superior Court reasoned that Brown had failed to show that the alibi witnesses were available to testify at trial. *Id.* at *10–11. Alternatively, the Superior Court concluded that even had El Shabazz been aware of the witnesses, their testimony would have been "merely cumulative." *Id.* at *12.

While Brown's appeal was pending in the Superior Court, he filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania. Following the Superior Court's affirmance, the Magistrate Judge conducted an evidentiary hearing regarding Brown's ineffective assistance of counsel claim.

The evidentiary hearing revealed that although he had hired an investigator, El Shabazz never received any information because he failed to pay the bill. *Brown v. Wakefield*, No. 07-1098, 2010 WL 2606443, at *12 (E.D. Pa. Jan. 28, 2010). El Shabazz then hired Grevious "less than one week prior to the start of trial." *Id.* at *9. The night before El Shabazz brought Szmyt and Osborne to court,

11

Grevious informed El Shabazz that he had found them and they were "ready and willing to testify." *Id.*

Osborne's and Szmyt's testimony at the federal evidentiary hearing added little to the witness statements they had submitted to the state courts. Osborne remembered that he was worried that Brown and his party might not pay their bill, that they eventually paid, and that it was "dark" when they left. *Id.* at *9–10. Szmyt reaffirmed that her prior statements were her true recollections of the events of that night, but she could "not really" recall the events by the time of the hearing.

El Shabazz testified that he failed to submit a notice of alibi for Osborne and Szmyt, as well as for an additional witness, Malik Easley. *Id.* at *12. El Shabazz stated that he would not have called Easley to testify because of strategic concerns,[3] but admitted that his failure to file a notice for Szmyt and Osborne impaired his defense of Brown. *Id.*

The Commonwealth also submitted evidence at the hearing. Philadelphia Police Detective John McDermott stated that he had driven the route from TGI Friday's to the corner of Conestoga and Girard and that the trip took twenty-one minutes in moderate traffic. *Id.* at *13. A diversion to

---

[3] If called at trial, Easley would have testified that he was present during the murder and that, although he did not clearly see the shooting, he knew Brown was not the assailant. *Id.* at *10. El Shabazz testified he would not have called Easley because his testimony would have corroborated some details of the descriptions of the shooter given by prosecution witnesses and would have placed a car similar to Brown's at the scene. *Id.*

Johnson's auto shop added only one or two minutes. *Id.* Using an almanac, Detective McDermott testified that the sun set on September 7, 1998, at 7:23 p.m. and that the end of "civil twilight" was 7:50 p.m. *Id.*

The Magistrate Judge recommended granting Brown's petition. According to the Magistrate Judge, El Shabazz's mistakes prejudiced Brown because the "evidence of guilt was hardly overwhelming," no murder weapon was ever found, and descriptions of the assailant were inconsistent. *Id.* at *15. He also noted that Osborne would have been the only disinterested witness to testify that Brown left the restaurant when it was "dark," which would have corroborated Bright's and Miller's testimony that Brown left the restaurant too late to be the shooter. *Id.*

The District Court adopted the Magistrate Judge's recommendation and granted Brown's petition, largely because it agreed that Osborne's testimony corroborated Brown's alibi. *Brown v. Wakefield*, No. 07-1098, 2010 WL 2596900, at *10 (E.D. Pa. June 24, 2010). Noting that the sun set at 7:23 p.m. and the end of civil twilight was 7:50 p.m., the District Court concluded that Osborne's testimony that Brown left TGI Friday's when it was "dark" placed Brown at the restaurant at least sometime between 7:23 and 7:50 p.m. *Id.* Because Yvonne Rorie testified that she saw Kareema Latimer meet with Brown fifteen to twenty minutes before the shooting, the District Court concluded that Brown would have had to be at the scene at about 8:00 p.m. *Id.* Brown testified that it took him fifteen minutes to drive to the auto shop and that he spent ten minutes there. And Detective McDermott testified at the evidentiary hearing that a similar trip took twenty-one minutes. *Id.* at *11. Based on that testimony, the District Court reasoned that "a jury could have

13

concluded from Osborne's testimony, had it been presented at trial, that [Brown] did not leave until twilight had ended, 7:50 p.m., a time when [Brown] would likely have been unable to reach the scene of the crime in sufficient time to meet with Kareema Latimer." *Id.* Moreover, Osborne's statement that Brown left when it was "dark" corroborated Miller's, Bright's, and Brown's testimony that Brown left after 8:15 p.m. *Id.*

The District Court did not adopt the Magistrate Judge's finding that Osborne had recalled Brown leaving when it was "nighttime, not just twilight," because Osborne testified only that it was "definitely dark outside." *Id.* The District Court also declined to adopt the Magistrate Judge's conclusion that El Shabazz was aware of alibi witnesses before the trial started. *Id.* This disagreement between the Magistrate Judge and the District Court was immaterial, however, because El Shabazz should have been aware of the witnesses. *Id.* at *12–13. Finally, the District Court adopted the conclusion that Osborne and Szmyt were "ready and willing to testify," based on the hearing testimony of El Shabazz, Grevious, Osborne, and Szmyt. *Id.* at *13.

In light of these factual findings, the District Court held that "the PCRA court's application of *Strickland*, and the Superior Court's affirmance, [were] unreasonable." *Id.* at *14. In doing so, the Court reached two overarching conclusions. First, the state courts applied the wrong standard for determining whether El Shabazz was ineffective because they did not sufficiently consider whether he conducted a diligent investigation into possible alibis for Brown. *Id.* at *14–16. Second, the state courts unreasonably concluded that Brown was not prejudiced by his counsel's mistakes. The state courts failed to properly consider whether there was a

14

reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. Such a probability existed, according to the District Court, because Osborne was a disinterested witness who "would have bolstered the credibility of the petitioner and other alibi witnesses." *Id.* at \*17. Regarding Osborne's testimony that it was "dark" when Brown left the restaurant, the Court wrote: "while not definitely proving that [Brown] could not have been at the scene of the crime . . . [it] puts into serious question whether [Brown] had enough time to make it . . . to the scene of the shooting . . . ." *Id.* The District Court also concluded that the state courts incorrectly regarded Osborne's and Szmyt's testimony as "cumulative." *Id.* at \*18. According to the Court, "where defense witnesses [were] impeached for having a close relationship to [Brown], and prosecution eyewitnesses had a conflict with [Brown's] family, the existence of disinterested witnesses corroborating [Brown's] alibi could weigh heavily in the jury's decision of which set of witnesses to credit." *Id.* Therefore, "a reasonable probability exist[ed] that, if the jury had heard Osborne's testimony, the jury would have found reasonable doubt." *Id.*

The Commonwealth raises two issues on appeal. First, it claims the District Court erred when it held an evidentiary hearing because Brown was not diligent in developing the factual record in state court. Second, it argues the District Court erred when it concluded that the state courts unreasonably applied federal law in denying Brown's petition.

## II

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254(a). Our jurisdiction lies under 28 U.S.C. §§ 1291 and 2253(a).

"We have plenary review over the District Court's grant of habeas corpus." *Washington v. Sobina*, 509 F.3d 613, 618–19 (3d Cir. 2007) (citing *Rolan v. Vaughn*, 445 F.3d 671, 577 (3d Cir. 2006)). "Accordingly, we will 'review the state courts' determinations under the same standard that the District Court was required to apply,'" which are the standards set forth in AEDPA. *Lewis v. Horn*, 581 F.3d 92, 100 (3d Cir. 2009) (quoting *Thomas v. Horn*, 570 F.3d 105, 113 (3d Cir. 2009)).

A federal court may not grant habeas relief to a person in state custody whose claims were adjudicated on the merits unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

16

III

As a threshold matter, the Commonwealth claims the District Court should not have granted Brown an evidentiary hearing. We agree based on *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), which the Supreme Court decided after the District Court ruled in this case. In *Pinholster*, the Supreme Court explained that: "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 1398.

Because we find *Pinholster* controlling, we review it in some detail. Pinholster was convicted in California state court of first-degree murder and sentenced to death. He sought post-conviction relief, claiming his counsel was ineffective at the penalty phase by failing to investigate or present mitigating evidence, including evidence that Pinholster suffered from mental disorders. *Id.* at 1396. The psychiatrist Pinholster's counsel consulted before trial, Dr. Stalberg, concluded that Pinholster did not suffer from a mental disorder. Not surprisingly, Dr. Stalberg was not called to testify at Pinholster's trial. *Id.* On collateral review, Pinholster supported his ineffective assistance claim with academic, medical, and legal records, as well as declarations from family members, one of his trial attorneys, and a psychiatrist, all of which suggested Pinholster suffered from bipolar mood and seizure disorders. *Id.* Pinholster's petition was denied. *Id.*

Pinholster filed a federal habeas petition in which he reiterated his ineffective assistance claim and added new allegations that his counsel failed to provide Dr. Stalberg with enough information to make an accurate report. *Id.* In support of Pinholster's new allegations, Dr. Stalberg declared

17

that had he known of evidence gathered after trial, he would have conducted "further inquiry" before concluding that Pinholster did not suffer from a mental disorder. *Id.*

The federal district court granted Pinholster an evidentiary hearing. *Id.* Before the hearing, however, Dr. Stalberg averred that the new evidence did not change his diagnosis. *Id.* at 1397. Consequently, Pinholster did not call him to testify at the hearing, opting instead for new experts whose testimony would be more favorable to him. *Id.* The state also offered evidence at the federal evidentiary hearing, calling a psychiatrist who denied that Pinholster suffered from a mental disorder. *Id.* The district court granted Pinholster habeas relief, and the Court of Appeals for the Ninth Circuit ultimately affirmed in an en banc opinion. *See Pinholster v. Ayers*, 590 F.3d 651 (9th Cir. 2009) (en banc). After considering evidence from the evidentiary hearing, the Ninth Circuit concluded that the California Supreme Court had unreasonably applied *Strickland*. *Id*. at 666–84.

The Supreme Court reversed, holding that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petition[er] must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Pinholster*, 131 S. Ct. at 1400 (footnote omitted). The Court reasoned that the purpose of 28 U.S.C. § 2254 is "to channel prisoners' claims first to the state courts" and that "[i]t would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*." *Id.* at 1398–99. The Court was puzzled by "the notion that a state court can be deemed to have unreasonably applied federal law to evidence it did not even know existed." *Id.* at 1399 n.3.

18

In light of *Pinholster*, district courts cannot conduct evidentiary hearings to supplement the existing state court record under 28 U.S.C. § 2254(d). Otherwise, federal habeas petitioners would be able to circumvent the finality of state court judgments by establishing a new factual record. This would contravene AEDPA, which requires petitioners to diligently present the facts in state court before proceeding to the federal courthouse. As the Supreme Court reaffirmed: "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state court proceedings." *Pinholster*, 131 S. Ct. at 1401 (citing *Williams v. Taylor*, 529 U.S. 420, 437 (2000)).

As in *Pinholster*, here Brown's state petition for post-conviction relief was denied on the merits, and he sought federal relief under 28 U.S.C. § 2254(d). Like Pinholster, Brown sought to supplement the record with evidence he never presented to the state courts. The Magistrate Judge conducted an evidentiary hearing to explore Brown's ineffective assistance claim, which essentially resulted in a *de novo* trial, as both sides marshaled new evidence for the federal hearing. This was contrary to AEDPA, which obliged the District Court to base its review only on the evidence Brown presented in state court. Therefore, we hold that the District Court erred in conducting an evidentiary hearing.[4]

---

[4] Although the parties' arguments regarding the propriety of the federal evidentiary hearing focus on 28 U.S.C. § 2254(e)(2), *Pinholster* renders that provision inapplicable to this case. When a prisoner has "failed to develop the factual basis of a claim in State court proceedings," § 2254(e)(2) bars a federal court from holding

19

IV

Having determined that the federal evidentiary hearing was improper, we consider Brown's habeas petition in light of the record he made in the Pennsylvania courts.

Brown claims the denial of his petition involved an "unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United

---

an evidentiary hearing unless certain statutory requirements are met. *Pinholster*, 131 S. Ct. at 1400 n.4.

Prior to AEDPA, "the decision to grant an evidentiary hearing was generally left to the sound discretion of district courts." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Brown v. Allen*, 344 U.S. 443, 463–64 (1953), and *Townsend v. Sain*, 372 U.S. 293, 313 (1963)). "AEDPA, however, changed the standards for granting federal habeas relief." *Id.* at 473. Accordingly, we previously recognized that so long as a petitioner does not run afoul of § 2254(e)(2), "the district court [is] permitted under the AEDPA, though not required, to grant an evidentiary hearing." *Goldblum v. Klem*, 510 F.3d 204, 220–21 (3d Cir. 2007) (citing *Campbell v. Vaughn*, 209 F.3d 280, 286–87 (3d Cir. 2000)). This is no longer the case in light of *Pinholster* and our holding today.

Although it speaks directly to the unavailability of evidentiary hearings to adjudicate claims brought under § 2254(d), the exact scope of § 2254(e)(2) is unclear after *Pinholster*. *See Pinholster,* 131 S. Ct. at 1401 n.8 ("We see no need in this case to address the proper application of § 2254(e)(2)."). It is clear, however, that our jurisprudence applying § 2254(e)(2) remains applicable "where § 2254(d)(1) does not bar federal habeas relief." *Id.* at 1401.

20

States." 28 U.S.C. § 2254(d)(1). Specifically, he contends it was unreasonable for the Superior Court to conclude that El Shabazz's failure to develop an alibi defense did not warrant a new trial based on *Strickland*. We disagree.

In determining whether a state court unreasonably applied federal law under 28 U.S.C. § 2254(d)(1), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). The question is not whether the state court's holding was wrong, but whether it was reasonable. Indeed, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)).

There is no dispute here as to the relevant clearly established law. Under *Strickland*'s familiar two-part test, we consider whether counsel's performance was deficient and, if so, whether it prejudiced Brown. *Strickland*, 466 U.S. at 687. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, the review is 'doubly so.'" *Harrington*, 131 S. Ct. at 788 (citations omitted). Accordingly, we are "not authorized to grant habeas corpus relief simply because we disagree with the state court's decision or because we would have reached a different result if left to our own devices." *Werts v. Vaughn*, 228 F.3d 178, 197 (3d Cir. 2000) (citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 889 (3d Cir. 1999)). The question is "whether there is any reasonable

21

argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

The Commonwealth has not challenged the District Court's holding that El Shabazz was deficient, so we will consider only whether his mistakes prejudiced Brown. To demonstrate prejudice, Brown must establish "a reasonable probability that, but for counsel's unprofessional errors, the result in the proceeding would have been different." *Strickland*, 466 U.S. at 694. He "need not show that counsel's deficient performance 'more likely than not altered the outcome of the case'—rather, he must show only 'a probability sufficient to undermine confidence in the outcome.'" *Jacobs v. Horn*, 395 F.3d 92, 105 (3d Cir. 2005) (quoting *Strickland*, 466 U.S. at 693–94). On the other hand, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Harrington*, 131 S. Ct. at 787 (citing *Strickland*, 466 U.S. at 693). Counsel's errors must be "so serious as to deprive the defendant of a fair trial." *Id.* at 787–88 (citing *Strickland*, 466 U.S. at 687). The likelihood of a different result must be substantial, not just conceivable. *Id.*

Anthony Brown has not shown that his counsel's failure to develop an alibi defense prejudiced his trial. Unlike many criminal prosecutions, the case against Brown was not based on circumstantial evidence. Tamika Thompson, Timmsel Rorie, and Yvonne Rorie all witnessed the murder and picked Brown out of a photo array. Tamika and Timmsel testified at trial that Brown was the assailant. Just minutes after the shooting, Tamika and Yvonne gave similar descriptions of the assailant to police, and those descriptions matched Brown's appearance. Tiffany Thompson, who saw the men approaching, told police that the shooter lived at

22

5408 Girard Avenue, where officers recovered clothing matching the descriptions given by Tamika and Yvonne, along with a photograph of Brown wearing those clothes, Brown's mail, and the traffic citation that Brown had received en route to TGI Friday's on the night of the shooting. Tamika also told police that the shooter drove a four-door gray car, a description matching Brown's automobile. Tamika also rebutted Brown's alibi by placing his car at Conestoga and Girard at the time of the murder, rather than at TGI Friday's or the auto shop.

In addition to physical evidence and eyewitness testimony, the prosecution presented a strong motive for the crime. The day of the murder, Brown's sister Kim was involved in a heated feud with the victim and her family. A Brown family friend, Kareema Latimer, had previously threatened to "spray the whole corner," and she was seen, just minutes before the murder, pointing out the Rorie home to Anthony Brown and four other men. Kevin Johnson testified that Kim Brown paged her brother Anthony at TGI Friday's to talk about the dispute between the Rories of Conestoga Street and the Browns of Girard Avenue, and Lynnette Bright and Tiyana Miller claimed to have seen Brown emerge from the restaurant to return that call on a pay phone. Although the timeline is inexact, the shooting occurred less than an hour later. Based on this evidence, the jury reasonably could have concluded that Anthony Brown killed Frances Rorie in retaliation for the dispute between the Rories and the Browns.

Nor would the excluded alibi witnesses, Osborne and Szmyt, have rebutted the prosecution's case. In their witness statements submitted to the PCRA court, Osborne and Szmyt merely recalled that Brown was at TGI Friday's on the evening of the murder, a fact the prosecution conceded

throughout the trial. Neither Osborne nor Szmyt remembered when Brown departed the restaurant, and Osborne could say only that the sun had set. The murder occurred shortly before 8:24 p.m., and Brown was seen conferring with Kareema Latimer five to twenty minutes earlier, so Osborne's and Szmyt's statements were consistent with the prosecution's theory of the case. A jury could have determined that Brown left the restaurant sometime after it appeared to Osborne that the sun had set and still had time to meet with Kareema Latimer shortly after 8:00 p.m. before opening fire around 8:23 p.m. Based on this timeline, it was not unreasonable for the Pennsylvania Superior Court to conclude that there was no prejudice under *Strickland* because the excluded testimony would have been "merely cumulative."

V

Even if the federal evidentiary hearing had been proper, we would hold that El Shabazz's deficient performance did not prejudice Brown. In holding otherwise, the District Court's "lengthy opinion . . . discloses an improper understanding of § 2254(d)'s unreasonableness standard and of its operation in the context of a *Strickland* claim." *Harrington*, 131 S. Ct. at 785.

The evidence presented at the evidentiary hearing added little to Brown's defense. The only addition to Osborne's prior statement in state court was his recollection that it was "dark" when Brown left the restaurant. This vague description is consistent with his prior testimony that the sun had set. Similarly, Szmyt testified only that her prior statement was an accurate recollection. Thus, Osborne's and Szmyt's hearing testimony merely confirmed their state court testimony.

24

Ironically, the Commonwealth presented the evidence the District Court found most helpful to Brown because it filled in some of the gaps in Brown's timeline. For example, Detective McDermott stated that it took approximately twenty-two to twenty-three minutes to make the trip from TGI Friday's to the corner of Conestoga and Girard. McDermott also testified that the sun set on September 7, 1998, at 7:23 p.m. and that the end of "civil twilight" was 7:50 p.m.

But that evidence too was insufficient to establish an alibi for Brown. Assuming Brown left the restaurant when it was "dark" between sunset (7:23 p.m.) and the end of "twilight" (7:50 p.m.), he could have reached the corner of Conestoga and Girard in time to meet with Kareema Latimer shortly after 8:00 p.m. If he left at 7:50 p.m. and drove the "twenty-two to twenty-three minutes" to the crime scene, he would have arrived between 8:12 and 8:13 p.m., eleven or twelve minutes before the murder.[5] Witnesses testified that the shooting started sometime "after five minutes" and perhaps "fifteen to twenty minutes" later, estimates that are far from precise. Even assuming that he left TGI Friday's at 7:50 p.m., Brown could have been the shooter. Moreover, a scenario in which he left as early as 7:23 p.m.—a full twenty-seven minutes earlier—is consistent with the record, even after the evidentiary hearing.

Despite the equivocal nature of this evidence, the District Court found prejudice and granted relief. In doing so, the District Court gave too little deference to the

---

[5] The District Court neither accepted nor rejected Brown's self-serving testimony that he stopped at the auto store, and we need not consider it.

Pennsylvania Superior Court. *See Harrington*, 131 S. Ct. at 786 ("The [court] appears to have treated the unreasonableness question as a test of its confidence in the result it would have reached under *de novo* review."). The proper question was whether fair-minded jurists could agree with the Superior Court, not whether it erred in denying relief. "An *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Pinholster*, 131 S. Ct. at 1411 (citing *Harrington*, 131 S. Ct. at 785). That is because "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 131 S. Ct. at 785.

The District Court concluded that "Osborne's testimony, had it been presented at trial, would have corroborated the testimony of other witnesses that placed petitioner at TGI Friday's at a time when petitioner *could not have been* at the scene of the murder in time to consult with Kareema Latimer at approximately 8:00 p.m. or to commit the shooting before 8:23 p.m." *Brown*, 2010 WL 2596900, at *18 (emphasis added). As the Commonwealth argues, determining that Osborne's testimony placed Brown at the restaurant too late for him to be the shooter required the Court to draw several inferences in Brown's favor:

> Even without crediting [Brown's] testimony about the [ten minute] stopover, [Brown] would have had to leave the restaurant by approximately 7:45 p.m., a time within twilight. As Osborne testified at the evidentiary hearing that "it wasn't light out . . . it was definitely dark outside," a jury *could have* concluded from Osborne's testimony, had it been presented at

trial, that petitioner did not leave until twilight had ended, 7:50 p.m., a time when petitioner *would likely* have been unable to reach the scene of the crime in sufficient time to meet with Kareema Latimer. The statement that it was "dark" out also provides corroboration to Miller's, Bright's, and [Brown's] testimony at trial that [Brown] did not leave the restaurant until after 8:15 p.m., a time when it would have *clearly* been dark out.

*Id.* (emphasis added).

Although the District Court correctly determined that a jury *could have* concluded Brown did not leave until after 7:50 p.m., or even 8:15 p.m., the critical question is whether a reasonable jury could have concluded otherwise. The sun set at 7:23 p.m., a half hour before "twilight" ended and almost an hour before 8:15 p.m., the time at which the District Court assumed that it was "clearly" dark outside. The District Court provides no explanation for why it might not have been "dark" at, for example, 7:30 p.m., when Brown would have had enough time to drive to the scene of the murder, making the uncorroborated ten-minute stop along the way. Kevin Johnson testified at trial that it was dark by 7:00 p.m., and Tiyana Miller testified that it was already dark when she and Lynnette Bright walked to the restaurant between 7:15 and 7:30 p.m. In fact, the sky could have been dark even *before* sunset because it rained shortly after the murder. Brown has not, and cannot, present incontrovertible evidence that it was "dark" *only* after 7:50 p.m. Though Osborne's testimony in some scenarios might suggest that Brown could not have been the assailant, several assumptions are necessary to reach that conclusion. But "*Strickland* places the burden on the

defendant . . . to show a 'reasonable probability' that the result would have been different." *Wong v. Belmontes*, 130 S. Ct. 383, 390–91 (2009). Brown cannot meet that burden in light of the speculative and equivocal nature of the evidence of record.

The District Court also emphasized that Osborne was the only disinterested witness who placed Brown at the restaurant. *Brown*, 2010 WL 2596900, at *18. In the District Court's view, "[f]inding that there is no prejudice solely because the testimony would be in accord with the testimony of others and thereby 'cumulative' is an unreasonable application of *Strickland*'s prejudice prong when such corroborative testimony would come from a witness that a jury could find more credible than those who testified at trial."[6] *Id.*

---

[6] The District Court concluded that "the state courts applied a blanket rule that testimony which would mirror other witnesses was 'cumulative' and could not be prejudicial." *Id.* at *16. We disagree that the state courts applied such a rule. Brown's state habeas petition was not denied "merely" because the excluded evidence was "cumulative." Rather, it was denied because the evidence was "merely cumulative." *Id.* at *14 n.9 ("As an appellant is not prejudiced by the failure of trial counsel to present merely cumulative evidence, an appellant's claim of ineffective assistance of counsel on this basis must fail." (quoting the Superior Court opinion)). In other words, the state courts reasoned that there was no prejudice because the excluded evidence did not add anything material to the existing record. *Cf. Pinholster*, 131 S. Ct. at 1410 ("The 'new' evidence largely duplicated the mitigation evidence at trial.").

Yet even if Osborne would have provided more credible testimony than other witnesses who placed Brown at the restaurant, it does not follow that there was a reasonable probability that Osborne's testimony would have made a difference. The District Court noted that "such corroborative testimony would come from a witness that a jury *could* find more credible than those who testified at trial," *id.* (emphasis added), but that does not mean that there is a reasonable probability that a jury *would* do so. Speculation is not enough under AEDPA. The Superior Court's determination must necessarily be unreasonable. *Cf. Pinholster*, 131 S. Ct. at 1410 ("The new material is thus not so significant that, even assuming . . . counsel performed deficiently, it was *necessarily* unreasonable for the [state court] to conclude that [there was no prejudice]." (emphasis added)).

Ultimately, the District Court reasoned that Osborne "could have corroborated large portions of [Brown's] alibi," which "placed [Brown] at the TGI Friday's at a time when [he] could not have been at the scene of the murder in time to consult with Kareema." *Brown*, 2010 WL 2596900, at *17–18. Had El Shabazz presented Osborne's testimony to the state court jury, it might have agreed with the District Court. But it is equally plausible that Osborne's testimony would have made no difference. Because AEDPA gives state courts the benefit of that doubt, the judgment of the District Court cannot stand. *See Harrington*, 131 S. Ct. at 780–81.

VI

For the reasons stated, we will reverse the judgment of the District Court granting Brown's petition for writ of habeas corpus.