NOT PRECEDENTIAL

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

No. 14-1541

MICHAEL RAINEY,

Appellant

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS;
SUPERINTENDENT OF THE STATE CORRECTIONAL INSTITUTION AT
GRATERFORD; THE DISTRICT ATTORNEY OF THE COUNTY OF
PHILADELPHIA;  THE ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No.: 2-10-cv-00891)
District Judge: Honorable Paul S. Diamond

Argued on July 12, 2016

(Opinion filed: September 27, 2016)

Before:  SMITH, JORDAN, and RENDELL, <u>Circuit Judges</u>

Ayanna Williams, Esquire **(Argued)**
Federal Community Defender Office for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 545 West
Philadelphia, PA 19106

Counsel for Appellant

Ryan Dunlavey, Esquire **(Argued)**
Susan E. Affronti, Esquire
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA 19107

Counsel for Appellees

O P I N I O N[*]

**RENDELL**, Circuit Judge:

In 1991, Michael Rainey was convicted of first-degree murder in the Philadelphia

Court of Common Pleas after a joint trial with his co-defendant George Williams. Rainey

contends that his Sixth Amendment right to confront the witnesses against him was

violated during his trial when the prosecution introduced an out-of-court statement given

by Williams, who did not testify at trial. The statement was redacted to replace Rainey's

name with an "X." Rainey seeks habeas relief, claiming that this redaction was

inadequate and that the use of the statement violated the Sixth Amendment, as established

by *Bruton v. United States*, 391 U.S. 123 (1968) and *Richardson v. Marsh*, 481 U.S. 200

(1987). We agree but, nevertheless, conclude that Rainey is not entitled to relief, as the

error did not have a substantial and injurious effect on the verdict. Rainey also contends

that his trial counsel was constitutionally deficient for failing to move for a severance of

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

his trial from Williams's. We find that any such error on counsel's part did not prejudice Rainey. We will therefore affirm the District Court's denial of Rainey's habeas petition.

## I. Background

Rainey and Williams were each charged with first-degree murder for their roles in the death of 72-year-old Carroll Fleming. Fleming's son found him lying face-down on the porch to the house they shared. Carroll Fleming was taken to the hospital where he was pronounced dead. A medical examination of Fleming's body revealed that the cause of his death was a shotgun wound to his back.

Rainey, Williams, and a third individual, Alvin Morgan, were arrested and charged with murder. Morgan accepted a plea deal before trial, agreeing to plead guilty to third-degree murder in exchange for his testimony against Rainey and Williams. Rainey and Williams were tried together.

### a. Trial

At the joint trial, two key eyewitnesses testified as to Rainey's role in the murder: Morgan and Kevin Lewis, a neighborhood acquaintance of Rainey, Morgan, and Williams. Lewis testified first. He testified that on December 7, 1989, he was walking home from his cousin's house when he came upon Rainey, Morgan, and Williams, who were walking down Sprague Street. He saw that the three were talking among themselves and heard that the conversation involved "something about money." A264. Lewis began talking with Williams. Williams told Lewis that "he was going down the street with [Rainey]," A264, and that he "[j]ust wanted his money." A265. Lewis then handed

3

Williams a broken .25 gun so that he could use it to scare the person from whom Williams wanted money.

Lewis testified that Williams took the broken gun and continued walking down the street with Rainey and Morgan. Lewis watched the three arrive at "the house," where Morgan stood a bit back on the sidewalk and Rainey and Williams stood on the porch. A272. Lewis saw Rainey approach the door to the house, and Lewis then heard Rainey "ask[] for his money." A272-73. He saw Rainey kick the door to the house. Lewis then saw "sparks" come from Rainey's long black leather trench coat and heard a sound like a gunshot. A273, 283. After the shot, Lewis turned away and "started walking up the street fast" away from the commotion. A273.

Lewis also testified that when he later saw Rainey in custody, Rainey confronted him about his cooperation with the investigation. Specifically, Lewis testified that Rainey "said why did I dime on him. Dime means tell on him." A313.

On cross examination, Lewis was asked about an earlier statement in which he said he saw Williams, not Rainey, knocking on the door. Lewis explained "I was scared, you know, and I—my story wasn't straight. I am going to come out and tell the truth and I am going to tell what happened. I don't want no problem. That's what I'm trying to say." A324. Lewis also affirmed that the government had suggested to him that if he did not "say the right thing"—in the words of Rainey's counsel—he "could be held to be part of some type of conspiracy because [he] let somebody hold [his] gun and the gun went and got involved in some kind of a incident." A319.

4

The prosecution next called Morgan. Morgan, who was 14 at the time of the shooting, was 16 when he testified. He had not yet been sentenced in connection with his guilty plea to third-degree murder, but he knew that his minimum possible sentence would be 5-10 years and his maximum possible sentence would be 25-50 years. He testified that he had known Rainey (who was four years older) for years and, prior to the shooting, would spend time with him every day. He had also known Williams for years but would see him less frequently than he would see Rainey.

Morgan testified that on the evening of December 7, 1989, he was with Rainey at Rainey's house. Rainey told Morgan that earlier he had been out buying alcohol and saw a man pull out "a lot of money." A337. After this conversation, Rainey brought out a sawed-off shotgun and began "playing with it. He had it in his hand, pulling the trigger." A339. Later that night, Williams arrived at the front porch of Rainey's house. Rainey and Williams began talking, and Morgan heard Rainey say "if he had to shoot somebody he was going to shoot them." A341. Rainey then went back in the house and came back outside, this time walking with one leg remaining stiff and his hand holding that leg. Morgan observed that Rainey was wearing a long black trench coat. Rainey and Williams began to walk down the street and Morgan followed.

Morgan testified that he then saw Lewis walking the opposite way along the street. Williams and Rainey talked briefly with Lewis, and Lewis gave "something shiny" to Williams. A345. Williams, Rainey, and Morgan then continued down the street; Lewis continued in the opposite direction.

Rainey and Williams then crossed the street away from Morgan. Morgan saw Rainey take the shotgun out of his pants and put something "yellow, like a shell," into the shotgun. A347.

Morgan testified that Williams then walked up on the porch of the house and knocked on the door. When nobody answered, Williams kicked the door and the door came open. A man came running out of the house, and Williams pulled the gun on him. Williams pulled the trigger, and the gun clicked but did not fire. Then Rainey, standing "[j]ust off the porch," shot the man in the back. A350. Rainey was about three feet away and shot the gun only once. The man fell on the porch. Williams told Rainey to "check his pockets." A353. Morgan heard police sirens shortly after the shot, however, and began to run, as did Rainey and Williams before they had checked the man's pockets. Morgan saw Rainey throw the gun onto the roof of a school.

Morgan testified that he saw Rainey the next day on Rainey's porch. Rainey "said the man was dead." A357. Then a week later Morgan saw the shotgun again at Rainey's house. Rainey "said he was going to break it up and throw it in a pond. . . . Because it had a murder on; because he killed somebody with it." A357.

Morgan also testified that Rainey had made several attempts to dissuade him from cooperating with the investigation and prosecution. Morgan had received letters from Rainey that encouraged Morgan to "do [his] part" meaning, according to Morgan, that Rainey "wanted [him] to blame it on [Williams]." A394. Morgan also said that one letter from Rainey had a number for a person named "Capon,"—Capon and Rainey were "like best friends," A396—and when Morgan called Capon, Capon told him to "blame it all on

[Williams]." A395. On the day Morgan testified, when he saw Rainey and Williams in their cells outside the courtroom, they told him to "[p]lead the Fifth." A359. Morgan also testified that Rainey had also told two other potential witnesses (Jonathon and Philip, who had been at Rainey's house with him and Morgan the day of the shooting) that "if anybody asks any questions, tell them that George [Williams] shot the man." A372.

The prosecution's next witness after Morgan was Detective Joseph Walsh of the Philadelphia Police Department. Detective Walsh testified about the arrest of Williams and how Williams was taken to into an interview room and read his *Miranda* rights. Williams then agreed to make a statement. As Detective Walsh was preparing to read the transcript of the interview with Williams to the jury, Rainey's counsel objected and the lawyers and the judge met at sidebar. At sidebar, the lawyers and the judge agreed that Rainey's name should be redacted from the transcript and replaced with "X."

Detective Walsh then read the transcript of Williams's interview to the jury. Williams said in the transcript that he and "X" and others were standing in front of "X's" house when "X" said, "Let's go stick somebody up." A411. "X" went into his house and came out wearing a long black trench coat and with a rifle down his pant leg, which caused him to walk with a limp.

The statement then read:

Then we got to a house and "X" told me to knock on the door, but I said "no." Then "Eyeball" [Morgan] started to knock on the door, and that was when "X" pulled out the gun. Then the old man said, "who is it?" and "X" hollered out, "open the door." Then the old man said, "We ain't got nothing." And "Eyeball" started to knock on the door again and told the old man, and the old man came rushing out, and when he came rushing out, "Eyeball" stepped out in the street and the old man came straight to me, and

7

I ducked. "X" was behind the old man, and "X" just shot him in the back. The old man fell face forward towards me. And I was so scared I just ran.

A412.

Detective Walsh continued reading the transcript, which detailed the aftermath of the shooting. Williams was asked about his subsequent contact with "X," and Williams described having a conversation with "X" at his house three days later. Detective Walsh, reading the transcript of the interview of Williams, read:

Question: "Was there anyone with you when you had this conversation with X?"
Answer: My brother-in-law, his name is Mike Williams, Black male, 23. He lives in West Philly around that movie, the Capitol."
. . .
"I can get his phone number from my grandmother."
Question: "Did you see Mike any other time since the murder?"

A416.

At this point, Rainey's lawyer objected. The prosecutor said, "Detective, review that. You may have read a typ[o]." A416. Detective Walsh corrected himself, saying, "Excuse me. 'Did you see "X" any other time since the murder?'" A416. Detective Walsh then continued reading the statement.

After Detective Walsh's direct examination ended, Rainey's counsel at sidebar again raised his objection about the Detective saying "Mike" instead of "X." Rainey's counsel requested a mistrial. Rainey's counsel contended that the Detective's having corrected his mistake and replaced "Mike" with "X" made clear that "X" was referring to Michael Rainey. The prosecutor contended that a mistrial was unnecessary and that a

8

curative instruction could mitigate any prejudice from Detective Walsh's mistake in reading "Mike" rather than "X."

The trial judge announced that he intended to issue a curative instruction that the jury was to disregard Detective Walsh's reading of the "typewritten mistake." A424. Rainey's counsel objected to this instruction, contending that such an instruction would call more attention to the mistake and further prejudice his client. The judge, positing that the jury believed the mistake to have been a typo, therefore did not issue a curative instruction and denied the mistrial.

The prosecution also presented several witnesses to describe the investigation of the crime scene and body. Officer Ross Barnes testified that the plexiglass on the door to Fleming's house had been displaced. The medical examiner testified that he found a fatal shotgun wound on the left side of Fleming's back. There were also barrel imprints on Fleming's back, indicating that the "shotgun was pressed right up against [Fleming's] back when it was fired." A446. There were no signs of a struggle. The examiner found a slug and cup in Fleming's heart. A firearms expert testified that the slug and cup, as well as a yellow plastic shell and four lead fragments that were recovered from the scene, were fired from a 20-guage shotgun.

Rainey presented three character witnesses in his defense. His sister testified that he had a reputation for being a truthful, law-abiding citizen. Rainey also presented two neighbors who had each known him for 10-11 years. They each testified that he had a reputation for being a truthful, law-abiding citizen.

During closing arguments, Rainey's lawyer argued that the evidence did not support a first-degree murder conviction, because neither of the two eyewitnesses offered any testimony about premeditation. He argued that the eyewitnesses only described a murder during the course of a robbery, which would only be second-degree murder. He also argued that the witnesses were unreliable and inconsistent. Rainey's counsel noted the deals that Morgan and Lewis had received in exchange for their testimony, arguing that such deals made them less reliable as witnesses. He pointed out that Lewis and Morgan gave inconsistent testimony as to whether Rainey was on the porch or at the bottom of the steps to the porch. He argued that if Rainey had been standing at the bottom of the steps to the porch, as Morgan testified, Rainey could not have shot Fleming, who was on the porch, as the medical evidence was that the shotgun had been placed against the back of Fleming before being fired.

The Prosecutor's closing statement first recapped the evidence against Rainey. The prosecutor then said:

> Two things the statement by George Williams consider this when you consider the evidence against George Williams. George Williams told Detective Walsh and Duffy and then Detective Piree that they said "Let's go stick somebody up[,"] "and then X went in his house and young boy did too that left me and eyeball outside th[e]n 'X' came out and he had changed his coat.["] When he came out he was wearing a long black leather coat corroborative of what Alvin Morgan testified to. ["]I saw the rifle he had it like down his pants leg.["]

A551.

Rainey's counsel objected and, at sidebar, moved for a mistrial because the prosecutor "said to this jury that the description of 'X' being in a black leather coat is

10

corroborative of what Alvin Morgan says and Alvin Morgan said Michael Rainey was in a leather coat." A552. The trial judge agreed that the prosecutor had indirectly identified who "X" was. The judge even told the prosecutor that he "blew the case for the Commonwealth." A553. The judge then adjourned the court for the day.

The trial judge met with counsel in chambers and announced his decision not to declare a mistrial but instead to instruct the jury that the statement by Williams could only be used against Williams. The judge believed that such an instruction would "cure any inferences that there might be some reference to Mr. Rainey by indirection." A571.

The prosecutor continued with his closing statement. He argued that there was sufficient evidence of premeditation to convict Rainey of first-degree murder. The prosecutor argued:

> There was no struggle with Michael Rainey. Michael Rainey put the gun to the back of [Carroll] Fleming and pulled the trigger and shot him in the back. This is not a gun going off subsequently in a struggle when no one anticipated it. This was a gun that was loaded moments before with the [intent] to use it. Placed in the back of a person and shot. That is not second degree murder I submit to you ladies and gentlemen. . . . Based on the evidence [that] is murder in the first degree and intentionally premeditated whether he had it fully formed in his mind back in the house to kill or just formed it when he pushed the gun forth.

A 582-83.

The judge then charged the jury. The judge instructed that Williams's statement was redacted because the law instructs that "if a statement is made by a person, that statement can only come in against that person." A599. The judge instructed that the statement could not be used "against anybody at trial except Mr. Williams." A600.

11

The jury then began deliberations. During deliberations, the jury sent a message to the court, which read, "We would like to hear George's statement to homicide detectives as to the conversation between George and 'X' in front of 'X's' house and as to the people down the street." A630. However, the statement was not available, as the court reporter who had transcribed the statement was out ill. The jury was instructed to rely on their best recollections of the evidence.

Four hours later, the jury reached a verdict against both defendants, finding Williams guilty of murder in the second degree and Rainey guilty of murder in the first degree.

### b. Post-Trial Proceedings

Rainey appealed his conviction. His appeal reached the Supreme Court of Pennsylvania, which issued an opinion in March 1995. *See generally Commonwealth v. Rainey (Rainey I)*, 656 A.2d 1326 (Pa. 1995). Rainey argued that his trial counsel was constitutionally ineffective in failing to obtain a mistrial after the alleged *Bruton* violations. *See id.* at 1331. The Supreme Court denied that claim, noting that trial counsel did object and move for a mistrial, and, at any rate, Rainey's rights under *Bruton* were not violated. *See id.* at 1332 n.5. Moreover, the Supreme Court found any such error harmless. *See id.*

Rainey next raised several claims in a petition under the Pennsylvania Post-Conviction Relief Act (PCRA). His petition was denied, and he appealed that ruling to the Pennsylvania Supreme Court. In 2001, Rainey's case was remanded for a more detailed PCRA opinion. *See Commonwealth v. Rainey (Rainey II)*, 786 A.2d 942, 942

12

(Pa. 2001). His petition was again denied and he again appealed to the Pennsylvania Supreme Court. In July 2007, his appeal was denied in relevant part. *See generally Commonwealth v. Rainey (Rainey III)*, 928 A.2d 215 (Pa. 2007).[1] The Pennsylvania Supreme Court rejected Rainey's argument that he was entitled to relief because of the introduction of Williams's redacted statement. *Id.* at 226. The court also denied Rainey's argument that trial counsel was ineffective in not moving to sever his trial from Williams's. *Id.* at 230-33. The court reasoned that severance was not likely to be granted, given the interests favoring joint trials, and that any prejudice was harmless given the overwhelming evidence against Rainey. *Id.* at 232.

Rainey filed a petition for a writ of habeas corpus in the Eastern District of Pennsylvania. He raised three issues: (1) his Sixth Amendment rights were violated by the use of Williams's redacted statement; (2) his counsel was ineffective in not moving to sever his trial from Williams's; and (3) his rights under *Batson v. Kentucky*, 476 U.S. 79 (1986), were denied. The District Court rejected all three claims and did not issue a certificate of appealability.

Our Court granted a certificate of appealability on two issues: (1) whether the District Court erred in denying Rainey's claim that his rights under the Confrontation Clause were violated; and (2) whether the District Court erred in denying Rainey's claim that his counsel performed ineffectively by failing to sever his trial from his Williams's.

---

[1] The court did grant Rainey's appeal as to an aspect of the penalty phase of his capital trial. *Id.* at 220. His case was remanded for resentencing, and the prosecution did not seek the death penalty on remand.

13

## II. Discussion

Rainey argues that he is entitled to relief because his Sixth Amendment right to confront witnesses against him was violated by the introduction and use of Williams's out-of-court statement, and because his counsel was ineffective in failing to timely move to sever his trial from Williams's. We ultimately agree with the Commonwealth that both alleged errors were harmless under the deferential *Brecht* standard of review.

### a. Legal Framework

We review the District Court's conclusions *de novo*, applying the same legal standard that the District Court should have applied. *Brown v. Wenerowicz*, 663 F.3d 619, 627 (3d Cir. 2011). Accordingly, we review the state-court decisions under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). *Id.*

A petitioner under 28 U.S.C. § 2254 must have first exhausted his state-court remedies. 28 U.S.C. § 2254(b)(1)(A). In doing so, he must have "fairly presented" his claim for relief to the state courts before a federal court can award relief on that claim. *See Nara v. Frank*, 488 F.3d 187, 197-98 (3d Cir. 2007). If a claim has been fairly presented to the state courts, we must then, under AEDPA, determine whether the state court reached a decision on the merits of a claim. *See Collins v. Sec'y of the Pa. Dep't of Corr.*, 742 F.3d 528, 544 (3d Cir. 2014). If, as here, the state court adjudicated the claim on its merits, we give substantial deference to that decision, reversing it only if was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States," or where the state-court

14

decision involves an "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1)-(2).

Even if a petitioner can demonstrate that his constitutional rights were violated, he will still only be entitled to relief if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, (1993). In addition to applying the *Brecht* standard, we must also examine the state court's application of the harmless error standard from *Chapman v. California*, 386 U.S. 18, 24 (1967), which applies on direct appeal and requires the government to show an error was harmless beyond a reasonable doubt. *See Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015). (citing *Chapman*, 386 U.S. at 24). In reviewing the state court's application of the *Chapman* standard, we apply AEDPA deference and ask only whether the state court was unreasonable in finding that the error was harmless beyond a reasonable doubt. *See id.* at 2198. The Supreme Court has clarified that the *Brecht* standard "subsumes" AEDPA deference. *Id.* Thus, while a court need not *formally* apply both *Brecht* and *Chapman*, it also cannot merely disregard the state court's conclusions, as "AEDPA nevertheless sets forth a precondition to the grant of habeas relief." *See id.* (internal quotation marks omitted).

*b. Confrontation Clause Claim*

1. Merits

We conclude that, because the Commonwealth's evidence and arguments so obviously and inescapably identified Rainey as "X," it was unreasonable for the state courts to find that the right announced in *Bruton* had not been violated.[2]

As an initial matter, we disagree with the Commonwealth's position that Rainey did not fairly presented his *Bruton* claim the state courts. The Commonwealth argues that Rainey needed to specify that the *Bruton* and *Marsh* cases alone—that is, without reliance on *Gray*, *see supra* note 2—entitled him to relief. But the Commonwealth is reading the exhaustion requirement too narrowly. To fairly present a claim, a petitioner need only "present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999). Indeed, a "petitioner need not have cited

---

[2] It would be even clearer under the law as currently established that Rainey's rights under the Confrontation Clause were violated. *See generally Gray v. Maryland*, 523 U.S. 185, 197 (1998) (holding that a co-defendant's statement "which substituted blanks and the word 'delete' for the [defendant's] proper name, falls within the class of statements to which *Bruton*'s protections apply."). On habeas review, however, with, perhaps, limited exceptions that do not apply here, we are limited to the question of whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time that the state court rendered its decision on the merits. *Greene v. Fisher*, 132 S. Ct. 38, 43-44 (2011). Here, Rainey's decision became final on direct review prior to the rule in *Gray* being announced. On collateral review, the Pennsylvania Supreme Court held that *Gray* represented a new rule of law that could not be applied retroactively to Rainey. *Rainey III*, 928 A.2d at 228. Rainey does not challenge this ruling. Thus, we cannot rely on the rule established in *Gray* when examining whether Rainey is entitled to relief. *Cf. Greene*, 132 S. Ct. at 45 ("The Third Circuit thus correctly held that *Gray* was not 'clearly established Federal law' against which it could measure the Pennsylvania Superior Court's decision.").

'book and verse' of the federal constitution" to have fairly presented a claim—let alone have cited the correct Supreme Court case law. *See id.* In addition to "reliance on pertinent federal cases," a petitioner can also fairly present a claim through "assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution;" or "allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Nara*, 488 F.3d at 198. Here, Rainey not only alleged a factual pattern well within the mainstream of Confrontation Clause litigation, he also specifically invoked the Confrontation Clause as well as *Bruton* and *Marsh*. *See* Initial Brief of Appellant at 16, *Rainey III*, 928 A.2d 215 (Pa. 2007) (Nos. 468 & 469 CPA), 2006 WL 2643351, at *16 (citing *Bruton* and *Marsh* for the propositions, respectively, that the admission of a codefendant's extra-judicial statement inculpating the defendant violates the Sixth Amendment and that the Confrontation Clause is violated if the co-defendant's statement is not redacted to remove all reference to the defendant). This was more than sufficient to put the state court on notice of his Confrontation Clause claim and we find that Rainey fairly presented his claim to the state courts. *See Nara*, 488 F.3d at 198.[3]

In assessing Rainey's claim, the state courts were unreasonable in concluding that his rights under the Confrontation Clause, as established by *Bruton*, had not been violated. By the time that Williams's statement was introduced at trial, the jury had

---

[3] Indeed, the Pennsylvania Supreme Court, in denying Rainey's PCRA appeal, acknowledged these arguments and found several of them to have been previously litigated. *See Rainey III*, 928 A.2d at 226-30. This finding by the Pennsylvania Supreme Court that these arguments were previously litigated "provides strong evidence that the claim has already been given full consideration by the state courts and thus is *ripe* for federal adjudication." *Cone v. Bell*, 556 U.S. 449, 467 (2009) (emphasis in original).

17

already heard from Lewis and Morgan. Both had testified that: (1) Rainey, Morgan, and Williams were the participants; (2) that Rainey was wearing a black leather trench coat; and (3) that Rainey was the shooter. Morgan had further testified that Rainey had, at his house, formulated the plot to rob Fleming and had used a sawed-off shotgun to shoot Fleming. Thus, by the time the statement from Williams was entered into evidence, there could have been no ambiguity as to the identity of the trench coat-wearing, shotgun-wielding "X," who planned the crime at his house, and then, alongside Williams and Morgan (whose names were not redacted), went to Fleming's house and shot Fleming. Even if there were any remaining doubt as to "X's" identity, all such doubt was surely erased after (1) Detective Walsh broke the redaction and identified "X" as Mike; and (2) the prosecutor argued that the jury could use the statement's description of "X" to corroborate Morgan's description of Rainey.

This went far beyond what the Supreme Court found permissible in *Marsh*. In *Marsh*, the statement at issue had been redacted to "eliminate not only the defendant's name, but any reference to his or her existence." 481 U.S. at 211; *see also Greene v. Palakovich*, 606 F.3d 85, 106 (3d Cir. 2010), *aff'd sub nom. Greene v. Fisher*, 132 S. Ct. 38 (2011) (finding no *Bruton* violation where "consistent with *Bruton* and *Marsh*, all references to the other defendants by proper name or nickname had been removed"). Here, on the other hand, "X" was the main focus of Williams's statement. Moreover, in *Marsh*, unlike here, the statement only implicated the defendant due to the fact that *after* the statement was introduced, the defendant herself testified and, by inference, implicated herself in the statement. Here, the prosecution itself introduced testimony that made

18

obvious the identity of "X" before the statement was introduced, and then, in closing argument, the prosecution again connected "X" to Rainey.

Given that there was no escaping the conclusion here that "X" was Rainey, the jury could not have been expected to follow the instruction not to use Williams's statement against Rainey. *Cf. Marsh*, 481 U.S. at 208 ("[W]ith regard to such an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget."); *Bruton*, 391 U.S. at 137 ("Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all."). We therefore conclude that the Pennsylvania Supreme Court was unreasonable in concluding that the use of Williams's statement here was not a violation of Rainey's clearly established Confrontation Clause rights.

2. Harmless Error

Notwithstanding our determination that the use of Williams's statement here violated Rainey's right to confront the witnesses against him, however, we must still determine whether those errors can be considered harmless. We conclude they were.

When determining whether a Confrontation Clause error was harmless we examine several factors, including "the importance of the witness' testimony in the

19

prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Weighing these factors, we ultimately ask if we are left with "grave doubt about whether [the error] had substantial and injurious effect or influence in determining the jury's verdict." *See Davis*, 135 S. Ct. at 2197–98 (internal quotation marks omitted).

Here, although Williams's statement was important to the prosecution's case, we nevertheless find the error harmless because the evidence of Rainey's guilt was so overwhelming and because Williams's statement was largely cumulative of the other evidence presented.

Rainey argues that only Williams's statement provides evidence of the specific intent needed for a first-degree murder conviction. We, however, agree with the Commonwealth that, absent Williams's statement, there was still overwhelming evidence that Rainey shot Fleming after having formed a specific intent to kill him. *Cf. Commonwealth v. Mikell*, 729 A.2d 566, 569 (Pa. 1999) ("To establish murder in the first degree, the Commonwealth must prove, *inter alia*, that the defendant specifically intended to kill, which fact is established by proof of premeditation and deliberation."). As the Commonwealth notes, "[a] specific intent to kill may be proven by circumstantial evidence and can be inferred from the defendant's use of a deadly weapon on a vital part of the victim's body." *Id.* (citation omitted). Morgan's testimony was clear that Rainey, after announcing that he would be willing to "shoot somebody," A341, and within

20

moments after loading a yellow shell into his sawed-off shotgun, fired a single shot, unprovoked, into Fleming's back at close range. *Cf. Commonwealth v. Randolph*, 873 A.2d 1277, 1281 (Pa. 2005) (finding that the firing of a gun into a victim's back qualified as use of a deadly weapon on a vital part of the victim and was sufficient evidence of a specific intent to kill). This account was corroborated by the medical examiner's testimony that the shotgun was first pressed against Fleming's back and then fired and that there were no signs of a struggle. It was corroborated also by the firearms expert's testimony that the projectiles and debris found in and around Fleming's body, including a yellow shell, came from a shotgun.

Morgan's account was also consistent with Lewis's testimony that it was Rainey who fired the only shot. Rainey argues, however, that Morgan's and Lewis's accounts were inconsistent and unreliable and therefore relatively weak evidence of specific intent. We disagree. Although the two accounts differ as to whether it was Rainey or Williams who knocked on the door, and as to whether Rainey was standing on the porch or at the bottom of the porch when he fired the shotgun, they agree as to the fundamentals: Rainey, Williams, and Morgan planned to rob Fleming; Fleming's door was kicked in; Williams's gun was inoperable; Morgan stood back from the house and witnessed the events; and, most crucially, Rainey fired the only shot. Both Morgan and Lewis also testified that Rainey had confronted them and encouraged them not to cooperate with the investigation or prosecution. Their accounts corroborated each other and were further corroborated by the investigatory evidence, including the displaced plexiglass from the door and the aforementioned medical and firearms evidence. Lewis and Morgan were

21

both, therefore, powerful witnesses, despite the deals they received in exchange for their testimony.

Because Williams's statement added next to nothing new to the overwhelming evidence of Rainey's guilt, we find that the *Bruton* violation did not have "substantial and injurious" effect on the jury's verdict, and the Pennsylvania Supreme Court did not act unreasonably in finding that the error was harmless beyond a reasonable doubt. We will therefore affirm the judgment of the District Court, and, consistent with the judgment of every court to consider the issue, find that the use of Williams's statement was harmless error.[4]

### c. Ineffective Assistance of Counsel Claim

Rainey also urges that his attorney was constitutionally ineffective in failing to move to sever Rainey's trial from Williams's. This claim lacks merit for essentially the reasons explained by the District Court and the state courts. To find in Rainey's favor we would need to find that his counsel's performance fell below an objective standard of reasonableness in failing to move for a severance, and that, but for this failure, there is a reasonable probability that the outcome of Rainey's trial would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Leaving aside the first prong—the reasonableness of counsel's decision not to seek a severance—we do not think that,

---

[4] Rainey notes that the jury requested to review Williams's statement again and argues that it shows that the jury was placing substantial weight on the statement. But this conclusion does not necessarily follow. First, the jury requested "the conversation between George and 'X'," A630, which suggests that they were respecting the redaction and not seeking to use the statement against Rainey. Secondly, the more plausible explanation for the request is that the jury wanted to use it to try and determine whether *Williams* had formed an intent to shoot Fleming.

22

absent trial counsel's error, there was a reasonable probability that Rainey would have been found not guilty. First, the trial court was unlikely to grant the motion to sever. *Cf. United States v. Voigt*, 89 F.3d 1050, 1095 (3d Cir. 1996) (holding that even "finger-pointing and blame-shifting among coconspirators do not support a finding of mutually antagonistic defenses" necessitating a severance of trials). More fundamentally, however, as we have discussed, the evidence establishing Rainey's guilt was overwhelming, and he would have been convicted regardless of whether he was tried jointly with Williams or separately. *See Breakiron v. Horn*, 642 F.3d 126, 147 n.18 (3d Cir. 2011) ("*Strickland* prejudice and *Brecht* harmless error are essentially the same standard.").

## III. Conclusion

For the foregoing reasons we will affirm the District Court's denial of Rainey's petition for a writ of habeas corpus.